IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JEFF TAYOUN                 :     Case No. 4:12-cv-0068
                              :
                              :
        Plaintiff,        :
                              :
        v.               :     (Judge Brann)
                              :
CITY OF PITTSTON, and    :
MAYOR JASON KLUSH     :
                              :
        Defendants.    :

**MEMORANDUM**
August 12, 2014

Before the Court is Defendants City of Pittston and Mayor Jason Klush's

Motion for Summary Judgment (ECF No. 23) on Plaintiff Jeff Tayoun's allegation

of retaliation for speech protected by the First Amendment to the United States

Constitution.  Plaintiff filed a Brief in Opposition (ECF No. 29) to the Defendants'

Motion and the issue is now ripe for disposition.  For the reasons discussed below,

the Defendants' Motion for Summary Judgment is denied.

## I.    BACKGROUND

Plaintiff Jeff Tayoun ("Plaintiff" or "Tayoun") was the Police Chief of the

City of Pittston.  Defs.' Statement Facts, ¶ 3, Aug. 13, 2013, ECF No. 25

[hereinafter Defs.' SOF].  In October 2009, he discovered forty-six (46) illicit

photographs on a Pittston Police Department computer.  Id. ¶ 4, Exs. B, D.  The

photographs, taken by Officer Robert J. Semyon, depicted "the nude body of the

victim (A.H.) who was unconscious or otherwise unaware that these photographs

were being taken.  Four photographs depict penetration of the victim's anus and

vagina."  Pl.'s Br. Opp'n Mot. Summ. J., Ex. A, Sept. 10, 2013, ECF No. 29

[hereinafter Pl.'s Br.].

     After discovering the photographs, Tayoun notified the Mayor of the City of

Pittston, then Mayor Donna Connors, and asked her to suspend Officer Semyon.

Defs.' SOF, ¶¶ 5–7; Pl.'s Statement Facts, ¶¶ 5–7 [hereinafter Pl.'s SOF].  Tayoun

also took the computer to the State Police Crime Lab for analysis.  Id.  He

participated in a meeting with Mayor Connors and members of the City Council to

discuss his discovery and what action they should take with respect to Officer

Semyon.  Defs.' SOF, ¶ 10. At the same time, Tayoun also notified the Office of

the Attorney General of Pennsylvania of his discovery and provided to it copies of

the photographs.  Pl.'s SOF, ¶¶ 7–8.

     The Pennsylvania Attorney General subsequently opened a criminal

investigation into Officer Semyon's conduct.  Pl.'s SOF, ¶ 9; Pl.'s Br., Exs. A, C.

As a result of this investigation, Officer Semyon was charged and pled guilty to

Aggravated Indecent Assault, among other charges.  See id.  Semyon served more

than a year in prison for his crimes.  Pl.'s Br., Ex. B.

Shortly after Tayoun's discovery and report of the photographs, Jason Klush was sworn in as Mayor of Pittston.  Defs.' SOF, ¶¶ 11, 14.  After assuming office, Mayor Klush demoted Tayoun from his position as Chief of Police.  Pl.'s SOF, ¶ 11. Tayoun also suffered other adverse actions at the hands of either Mayor Klush or other Police Department or city officials, including: that he was required to use Officer Semyon's old locker that still contained Semyon's personal effects; that fellow co-workers were not allowed to donate sick time to Tayoun as others had done in the past; that Tayoun was required to complete daily activity logs when other officers were not; and that city officials allegedly killed Tayoun's fish in his office fish tank.  Id.  Tayoun alleges that he suffered these adverse actions, principally his demotion from Police Chief, as a result of his report to the Pennsylvania Attorney General about Officer Semyon's criminal activity.  Id. Tayoun believes he was demoted "because [he] turned in another cop who was friends with [Mayor Klush]."  Pl.'s Br., Ex. 6, Tayoun Dep. Tr., 22:9-12 [hereinafter Tayoun Dep.].

Mayor Klush alleges that he had the power to change the Police Chief at will, and believed it was time for a change when he assumed his duties as Mayor. Defs.' SOF, ¶ 17.  Regarding the other accusations, he asserts either that he

allowed the new Police Chief to run the force in the manner he chose to accomplish his duties, or that he was not otherwise involved.  See generally Pl.'s Br., Ex. 4, Klush Dep. Tr. [hereinafter Klush Dep.].

Tayoun filed this action alleging retaliation for speech protected by the First Amendment in light of these facts.

## II.    DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A fact is "material" where it "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is "genuine" where "the evidence is such that a reasonable jury," giving credence to the evidence favoring the nonmovant and making all inferences in the nonmovant's favor, "could return a verdict for the nonmoving party."  Id.

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment.  In re Bressman, 327 F.3d 229, 237 (3d Cir. 2003) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 331 (1986) (Brennan, J., dissenting)).  The moving party may satisfy this burden by either (i) submitting

affirmative evidence that negates an essential element of the nonmoving party's claim; or (ii) demonstrating to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's case. Id. at 331.

Where the moving party's motion is properly supported, the nonmoving party, to avoid summary judgment in his opponent's favor, must answer by setting forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson, 477 U.S. at 250. For movants and nonmovants alike, the assertion "that a fact cannot be or is genuinely disputed must" be supported by "materials in the record" that go beyond mere allegations, or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1); see also Anderson, 477 U.S. at 248–50.

"When opposing summary judgment, the non-movant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'" Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co., 311 F.3d 226, 233 (3d Cir. 2003). Furthermore, "[i]f a party fails to properly support an assertion of fact or fails to properly address

another party's assertion of fact as required by Rule 56(c), the court may . . .

consider the fact undisputed for purposes of the motion." FED. R. CIV. P. 56(e)(2).

In deciding the merits of a party's motion for summary judgment, the

Court's role is not to evaluate the evidence and decide the truth of the matter, but

to determine whether there is a genuine issue for trial.  Anderson, 477 U.S. at 249.

Credibility determinations are the province of the factfinder, not the district court.

BWM, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

## B.   **Plaintiff's First Amendment Retaliation Claim Survives Summary Judgment**

To assert a retaliation claim under the First Amendment to the United States

Constitution, a plaintiff must establish three elements: "(1) constitutionally

protected conduct, (2) retaliatory action sufficient to deter a person of ordinary

firmness from exercising his constitutional rights, and (3) a causal link between the

constitutionally protected conduct and the retaliatory action."  Thomas v.

Independence Twp., 463 F.3d 285, 296 (3d Cir. 2006).  The Defendants assert

Plaintiff's report of Officer Semyon's criminal activity was not constitutionally

protected conduct.

In a landmark case on the issue of whether conduct is constitutionally

protected, Garcetti v. Ceballos, 547 U.S. 410 (2006), the Supreme Court of the

United States held that "when public employees make statements pursuant to their

6

official duties, the employees are not speaking as citizens for First Amendment

purposes, and the Constitution does not insulate their communications from

employer discipline." Garcetti v. Ceballos, 547 U.S. 410, 421 (2006).  By contrast,

"[w]hen an employee speaks as a citizen addressing a matter of public concern, the

First Amendment requires a delicate balancing of the competing interests

surrounding the speech and its consequences." Id. at 423; see also Pickering v. Bd.

of Educ. of Tp. High Sch. Dist. 205, Will Cnty. Illinois, 391 U.S. 563, 568 (1968)

("The problem in any case is to arrive at a balance between the interests of the . . .

citizen, in commenting upon matters of public concern and the interest of the State,

as an employer, in promoting the efficiency of the public services it performs

through its employees.").

    In the wake of Garcetti, the United States Court of Appeals for the Third

Circuit has held that:

> A public employee's statement is protected activity only where (1) the
> employee spoke as a citizen (2) about a matter of public concern and
> (3) "the government employer did not have an adequate justification
> for treating the employee differently from any other member of the
> general public as a result of the statement he made."

Hara v. Pennsylvania Dept. of Educ., 492 Fed. App'x 266, 267 (3d Cir. 2012)

(quoting  Hill v. Borough of Kutztown, 455 F.3d 225, 241–42 (3d Cir. 2006)

(internal quotations omitted)).

Accordingly, the Third Circuit also explained that a court should "proceed through three steps to ascertain whether a public employee's speech is protected by the First Amendment."  Morris v. Philadelphia Hous. Auth., 487 Fed. App'x 37, 39 (3d Cir. 2012).  The Court delineated the steps, writing:

> First, as a threshold issue, we must determine whether the employee's speech was made pursuant to his or her official duties, and therefore was unprotected by the First Amendment, or whether it was constitutionally protected speech made as a citizen. . . .  If the speech was not made pursuant to an employee's official duties, we proceed to the analysis set forth in Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and consider whether "the employee spoke as a citizen on a matter of public concern."  Garcetti, 547 U.S. at 418, 126 S.Ct. 1951.  If the answer to that question is yes, we must determine "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public."  Id.

Morris, 487 Fed. App'x at 39.  This Court proceeds with this inquiry under the facts of this case.

### 1.   Plaintiff's Report to the Attorney General's Office Was Action Outside His Official Duties

The Defendants' principle contention in their Motion for Summary Judgment is that the Plaintiff fails to satisfy the first element of the retaliation test: that he did not engage in constitutionally protected conduct because his report of Officer Semyon's criminal activity was attendant to his official duties.  To discern whether the activity in question was performed as a private citizen or as part of a

public employee's official duties, it is necessary to establish the content and scope of those duties.  See, e.g., Garcetti, 547 U.S. at 424–25.

Writing for the Court in Garcetti, Justice Kennedy stated that, because the issue was not in dispute in that case, it was "no occasion to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate."  Garcetti, 547 U.S. at 424.  Justice Kennedy continued, however, noting that:

> The proper inquiry is a practical one.  Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.

Id. at 424–25.

Considering the practical inquiry referenced in Garcetti with more specificity, the Third Circuit has held that "whether a particular incident of speech is made within a particular plaintiff's job duties is a mixed question of fact and law."  Foraker v. Chaffinch, 501 F.3d 231, 240 (3d Cir.2007); see also Reilly v. City of Atl. City, 532 F.3d 216, 227 (3d Cir. 2008).  A court engaged in this practical inquiry should examine, among other things:

> (1) whether the employee's speech relates to "'special knowledge' or 'experience' acquired through his job," [Gorum v. Sessoms, 561 F.3d 179, 185 (3d Cir. 2009) (quoting Foraker v. Chaffinch, 501 F.3d 231,

240 (3d Cir. 2007))]; (2) whether the employee raises complaints or concerns about issues relating to his job duties "up the chain of command" at his workplace, <u>Foraker</u>, 501 F.3d at 241; (3) whether the speech fell within the employee's designated responsibilities, <u>Gorum</u>, 561 F.3d at 186; and (4) whether the employee's speech is in furtherance of his designated duties, even if the speech at issue is not part of them.

<u>Kimmett v. Corbett</u>, 554 Fed. App'x 105, 111 (3d Cir. 2014).

The Third Circuit has "consistently held that complaints up the chain of command about issues related to an employee's workplace duties—for example, possible safety issues or misconduct by other employees—are within an employee's official duties." <u>Morris</u>, 487 Fed. App'x at 39. The fact that the speech in question concerns the subject matter of the person's employment, however, is not dispositive. <u>Garcetti</u>, 547 U.S. at 420.

For example, in <u>Foraker v. Chaffinch</u>, 501 F.3d 231 (3d Cir. 2007),[1] the Third Circuit held that Delaware State Troopers' complaints about poor conditions at a firing range were not protected by the First Amendment because the statements were made pursuant to their official duties. The troopers first reported the poor conditions at the range up their internal chain of command, and then to the State Auditor, an entity not ordinarily within their chain of command. <u>Foraker</u>, 501 F.3d

---

[1] The Supreme Court subsequently abrogated a portion of this decision concerning the First Amendment's Petition Clause in <u>Borough of Duryea, Pa. v. Guarnieri</u>, 131 S.Ct. 2488 (2011). The Supreme Court's abrogation of <u>Foraker v. Chaffinch</u>, 501 F.3d 231 (3d Cir. 2007), did not fully affect its application to the case *sub judice*.

at 233–34.

The Third Circuit enunciated an important distinction with respect to the troopers' report to the State Auditor, an external entity to which the troopers' owed no ordinary official duty of reporting.  Id. at 243.  Writing for the panel, Judge D. Brooks Smith stated:

> We recognize that giving statements to the State Auditor was not part of their everyday duties and that Garcetti leaves open the possibility that speech within the workplace relating to non-job issues is protected.  However, [one trooper] explained that he spoke to the auditors because "[i]t was my duty to speak to the auditors.  The order came down from the executive office of the State of Delaware, meaning the Governor's office.  I am bound by that order."  Although this speech was compelled by their employer, this fact alone does not locate the speech within the realm of [the troopers'] job duties.  Rather, what is dispositive is that the prior statements of [the troopers] within the chain of command prompted the order to speak with the State Auditor.  Because the speech that motivated the order was within their job duties, the responsibility to respond to the subsequent order was also within the scope of their duties.

Foraker, 501 F.3d at 243.

The United States Court of Appeals for the Ninth Circuit further extrapolated on this distinction in a recent *en banc* decision, Dahlia v. Rodriguez, 735 F.3d 1060 (9th Cir. 2013).  In that case, a police detective brought a retaliation suit against his Police Chief, the city, and other officers, alleging that he was placed on administrative leave after disclosing the alleged use of abusive interrogation tactics by other officers.  Dahlia v. Rodriguez, 735 F.3d 1060, 1065

11

(9th Cir. 2013).  The police detective reported the alleged abusive tactics both up the chain of command pursuant to his professional duties, and later to the police department's Internal Affairs.  Id. at 1077.  The Ninth Circuit concluded that, because the defendants did not establish that meeting and cooperating with Internal Affairs was a component of a police officer's duties, the plaintiff adequately alleged that his activity with Internal Affairs was outside the scope of his duties sufficient to satisfy that element of the First Amendment retaliation inquiry.  Id.

In the case *sub judice*, Tayoun reported his conduct both to the Mayor, a person in his ordinary chain of command, and to the Pennsylvania Attorney General, an unaffiliated entity not ordinarily within his chain of command.  The Defendants establish Tayoun's responsibilities toward the Mayor by citing Pennsylvania's Third Class City Code, which governs the City of Pittston and stated:

> Policemen shall obey the orders of the mayor and make report to him, which report shall be laid by him before council monthly.  The mayor shall exercise a constant supervision and control over their conduct.

53 P.S. § 37007 (amended May 19, 2014).[2]

---

[2] The legislature subsequently amended the statue to read:

The Police Chief shall obey the orders of the mayor and make report to the mayor, which report shall be presented monthly by the mayor to council.

53 P.S. § 37007.

This statutory pronouncement is certainly sufficient to relegate both Tayoun's report to the Mayor and the subsequent City Council meeting as activities within the scope of his duties.  Tayoun's act of bringing the computer to the State Police Crime Lab for analysis also probably falls within the orbit of his official duties as well, although even this finding stretches the outer limits of the amorphous job duties the Defendants allege.

Indeed, beyond this lone citation to the Third Class City Code, the Defendants' did not establish any other specific official or practical requirements for Tayoun's job as the Police Chief.  Defendants do not have an official job description for the Police Chief position, and Mayor Klush was unable to enumerate the specifics of any such description.  See Klush Dep., at 33:10–19. Aside from presenting hyperbolic conclusory statements unsupported by evidence, the Defendants did not establish that the Police Chief had any general duty to report to the Pennsylvania Attorney General, or that Tayoun was under an order or duty to report to the Attorney General in this particular instance.

Because reporting this nefarious activity to the Attorney General was not an element of Tayoun's official duties, Tayoun acted as a private citizen when reporting these issues independently to that office.  See, e.g., Davis v. McKinney, 518 F.3d 304, 313 (5th Cir. 2008) ("If however a public employee takes his job

concerns to persons outside the work place [sic] in addition to raising them up the chain of command at his workplace, then those external communications are ordinarily not made as an employee, but as a citizen."); <u>Freitag v. Ayers</u>, 468 F.3d 528, 545 (9th Cir. 2006) ("[A plaintiff's] right to complain both to an elected public official and to an independent state agency is guaranteed to any citizen in a democratic society regardless of his status as a public employee.").

2.   <u>Plaintiff's Report of Officer's Criminal Activity Was Speech Regarding a Public Concern</u>

Tayoun's report as a citizen to the Pennsylvania Attorney General may qualify for First Amendment protection if it raised a matter of public concern.  <u>See, e.g.</u>, <u>Connick v. Myers</u>, 461 U.S. 138, 143 (1983).  The concept of a public concern has proven nebulous at its fringes, and eludes a definition capable of precise application that is consistent throughout our jurisprudence.  <u>See San Diego v. Roe</u>, 543 U.S. 77, 83 (2004) ("[T]he boundaries of the public concern test are not well defined.").  Indeed, "our cases have provided little concrete guidance on the question of when . . . a complaint amounts to an issue of public concern." <u>Montone v. City of Jersey City</u>, 709 F.3d 181, 194 (3d Cir. 2013) (internal quotations omitted).

There exists no "bright-line rule . . . to determine '[w]hether an employee's speech addresses a matter of public concern."  <u>Campbell v. Galloway</u>, 483 F.3d

14

258, 269 (4th Cir. 2007) (quoting <u>Connick</u>, 461 U.S. at 147–48).  Rather, the

United States Supreme Court instructs courts to engage in a case- and fact-specific

inquiry that considers "the content, form, and context of a given statement, as

revealed by the whole record." <u>Connick</u>, 461 U.S. at 147–48.

In <u>Snyder v. Phelps</u>, 131 S.Ct. 1207, 1216 (2011), Chief Justice John

Roberts attempted to articulate a workable test to discern whether a given

statement is a public concern.  Chief Justice Roberts formulated a disjunctive

inquest, writing:

> Speech deals with matters of public concern when it can "be fairly
> considered as relating to any matter of political, social, or other
> concern to the community," <u>Connick</u>, *supra*, at 146, 103 S.Ct. 1684,
> or when it "is a subject of legitimate news interests; that is, a subject
> of general interest and of value and concern to the public," [<u>San Diego
> v. Roe</u>, 543 U.S. 77, 83 (2004)].

<u>Snyder v. Phelps</u>, 131 S.Ct. 1207, 1216 (2011) (Roberts, C.J.).

The "concern to the community" inquiry derived from the case of <u>Connick</u>

<u>v. Myers</u>, 461 U.S. 138, 146 (1983), while the "legitimate news interests" inquiry

derived from <u>City of San Diego v. Roe</u>, 543 U.S. 77, 83–84 (2004).

Unfortunately, however, the Supreme Court failed to articulate the difference in

application between the two prongs of this test.[3]

---

[3] For a thoughtful analysis of the merits and demerits of the Supreme Court's formulation
in <u>Phelps</u>, <u>see</u> Clay Calvert, *Defining "Public Concern" After Snyder v. Phelps: A Pliable
Standard Mingles with News Media Complicity*, 19 VILL. SPORTS & ENT. L.J. 39, 52–58 (2012).

Demonstrating the Connick inquiry's continued prominence in the wake of

Snyder, the Third Circuit wrote:

> Applying the analytical framework laid out by the Supreme Court in
> Connick, we noted that the key to the "public concern" inquiry is
> "whether expression of the kind at issue is of value to the process of
> self-governance." [Azzaro v. Cnty. of Alleghny, 110 F.3d 968, 977
> (3d Cir. 1997) (en banc).] We further explained that "the issue is
> whether it is important to the process of self-governance that
> communications on this topic, in this form and in this context, take
> place." Id. at 977.

Montone v. City of Jersey City, 709 F.3d 181, 193 (3d Cir. 2013).

Attempting to sharpen the distinction between public and private concerns,

courts have placed emphasis on the speaker's motivations for the speech under the

context element[4] of the inquiry—primarily personal motivations for the speech

may remove speech from the province of public concern. See, e.g., Feldman v.

Philadelphia Hous. Auth., 43 F.3d 823, 829 (3d Cir. 1994). "[P]ublic speech

'cannot constitute merely personal grievances.'" Brennan v. Norton, 350 F.3d 399,

412 (3d Cir. 2003) (quoting Feldman, 43 at 829). "Speech that is necessary or

appropriate to enable citizens to make informed decisions about the operation of

---

Prior to the Phelps decision, another scholarly commentator observed that the newsworthiness standard "involves essentially the same inquiry as a 'public concern' test." Mary-Rose Papandrea, *Citizen Journalism and the Reporter's Privilege*, 91 MINN. L. REV. 515, 580 (2007).

[4] Courts also consider a speaker's motivation under the "form" element of the public concern inquiry. See Delgado v. Jones, 282 F.3d 511, 519 (7th Cir. 2002).

16

their government is of public concern, while speech by public employees

addressing individual personnel disputes and grievances is not." Pool v.

VanRheen, 297 F.3d 899, 906 (9th Cir. 2002).  Thus, it is clear that "the

quintessential employee beef" is *not* a public concern.  Murray v. Gardner, 741

F.2d 434, 438 (D.C. Cir. 1984).

For example, while complaints about personal abuses suffered at the hands

of public employees do not generally rise to the level of public concern,[5] speech

regarding a public employee's criminal activity not exclusively directed at the

speaker generally does constitute  a public concern.[6]   Nevertheless, a speaker's

personal "motivation is merely one factor to be considered."  Versarge v. Twp. of

Clinton N.J., 984 F.2d 1359, 1365 (3d Cir. 1993) (internal quotations omitted).

With respect to the speech's content, the Third Circuit has noted that

"speech may involve a matter of public concern if it attempts to bring to light

---

[5] See, e.g., Bell v. City of Philadelphia, 275 Fed. App'x 157, 159 (3d Cir. 2008) (finding complaints of personally experiencing alleged gender and race discrimination by supervisors in a public office was not a matter of public concern); Feldman v. Cmty. Coll. of Allegheny (CCAC), 85 Fed. App'x 821, 825 (3d Cir. 2004) (finding that discrete complaint of racial and religious animus by a supervisor was a private matter not of public concern); Middleton v. Deblasis, 844 F. Supp. 2d 556, 565 (E.D. Pa. 2011) (finding that plaintiff's complaints about her own abuse and mistreatment by her superiors was not a matter of public concern).

[6] See, e.g., Dahlia v. Rodriguez, 735 F.3d 1060 (9th Cir. 2013) (finding that police detectives speech disclosing alleged use of abusive interrogation tactics by other officers commented on a matter of public concern); Swineford v. Snyder Cnty. Pa., 15 F.3d 1258, 1271 (3d Cir. 1994) ("[S]peech disclosing public officials' misfeasance is protected while speech intended to air personal grievances is not.").

actual or potential wrongdoing . . . on the part of government officials."

Baldassare v. State of N.J., 250 F.3d 188, 195 (3d Cir. 2001) (internal quotations

and citation omitted).  "Our jurisprudence makes clear that an internal investigation

into the alleged criminal actions of public employees falls squarely within the core

public speech delineated in Connick."  Id. at 196–97.  "[A]llegations of criminal

behavior against . . . fellow officers could touch upon a matter of public concern."

Sebast v. Mahan, 09-CV-98 GLS-RFT, 2009 WL 2256949, *2 (N.D.N.Y. July 28,

2009).  Furthermore, "[a] complaint arising out of public employment need not

include indications that there is a systemic problem . . . to address a matter of

public concern."  Morgan v. Covington Twp., —Fed. App'x—, 2014 WL 1465723

(3d Cir. Apr. 16, 2014) (internal quotations omitted).

For example, in Baldassare v. State of New Jersey, 250 F.3d 188, 197 (3d

Cir. 2001), the Third Circuit held that a county investigator's speech in connection

with an investigation of fellow law enforcement officers was on a matter of public

concern.  In that case the investigator worked for the county prosecutor's office

and investigated allegations that two colleagues bought vehicles previously leased

by the county well below market price.  Baldassare, 250 F.3d at 192–94.  The

investigator reported the alleged criminal activity to his superior, who then notified

the state attorney general's office.  Id.

A deputy attorney general who was friendly with the two accused public employees engaged in retaliatory conduct against the investigator. Id. at 192–94. The investigator subsequently sued alleging, *inter alia*, a retaliation claim under the First Amendment. Id. The Court found that the investigator's speech on the alleged criminal activity of his fellow officers constituted a public concern. Id. at 195–97.

Similarly, in Montone v. City of Jersey City, 709 F.3d 181, 193–95 (3d Cir. 2013), the Third Circuit held that a police officer's speech alleging sexual harassment by a superior against herself and several fellow officers involved a matter of public concern. In that case, the plaintiff complained about multiple instances of inappropriate conducted directed towards her, as well as complaints of inappropriate conduct directed towards other females. Montone, 709 F.3d at 194. The Third Circuit found the plaintiff's speech met the public concern threshold because the allegations concerned a police officer exercising authority on behalf of the public and the alleged misconduct concerned women other than the defendant. Id. at 193–95.

In contrast, in Middleton v. Deblasis, 844 F. Supp. 2d 556, 563–65 (E.D. Pa. 2011), a court found it was not a public concern when a police officer brought a retaliation claim against her city employer after making allegations of racial and

19

sexual discrimination by her supervisors.  The court stated that "plaintiff complains

solely about her own abuse and mistreatment by superiors, which is not a matter of

public concern."  <u>Middleton v. Deblasis</u>, 844 F. Supp. 2d 556, 565 (E.D. Pa. 2011).

In the case before the Court, Tayoun spoke to the Pennsylvania Attorney

General on a matter of public concern.  <u>See, e.g.</u>, <u>Baldassare</u>, 250 F.3d at 192–94.

Admittedly, neither the Court nor the Parties discovered an individual case that

directly places this matter squarely within or outside of the existing confines of the

public concern question.  Nevertheless, considering the principles, policy, and

normative considerations underlying the public concern analysis, the facts of this

case demonstrate that Tayoun spoke on a matter of public concern.  <u>See</u> <u>id.</u>

First considering the content of the speech, it is undoubtedly a public

concern that those charged with the duty and privilege to enforce the law be law

abiding citizens themselves.  <u>See</u> <u>Azzaro v. Cnty. of Allegheny</u>, 110 F.3d 968, 978

(3d Cir. 1997) (finding that a communication that brought to light actual

wrongdoing on the part of one exercising public authority related to matters of

public concern).  Like the plaintiffs in <u>Baldassare</u>, Tayoun's speech concerned the

criminal activity of a fellow officer.  <u>See</u> <u>Baldassare</u>, 250 F.3d at 192–94.

Significantly, the officer stored the evidence of that criminal activity on a police

department computer—equipment supplied by taxpayer labor and the public

monies it produced.

More significantly still, the fact that Tayoun's speech led to a successful criminal prosecution of the offending police officer further indicates its public import.  "Certainly, a communication by a law enforcement officer that contains information essential to a complete and objective investigation of serious criminal activity is content that implicates public concern."  <u>Delgado v. Jones</u>, 282 F.3d 511, 517–18 (7th Cir. 2002).  Based on Tayoun's information, the Attorney General's Office successfully prosecuted Officer Semyon, who subsequently served over a year in prison for his criminal activity.

Considering the context, the record does not indicate Tayoun had any personal motivation for his speech.  The speech did not concern any abuse or mistreatment Tayoun suffered at the hands of his employers and the thrust of his speech did not relate to an employment dispute.  <u>See</u> <u>Middleton</u>, 844 F. Supp. 2d at 565.  Tayoun had no personal interest in his speech aside from his interest as a member of the public in ensuring that officers of the law are themselves law abiding.

The form of the speech, a private report to the Pennsylvania Attorney General, is not a material consideration for the outcome of this case.  Private statements that are not made publicly are protected by the First Amendment if they

involve matters of public concern.  See Givan v. Western Line Consolidated Sch.

Dist., 439 U.S. 410, 415 (1979).

Accordingly, the content, context, and form of Tayoun's speech—reporting

a police officer's criminal activity to the Pennsylvania Attorney General's Office,

which lead to the successful criminal prosecution of that officer—demonstrate that

Tayoun's speech was on a matter of public concern.

3.     Material Facts Remain Disputed Regarding Whether the City
Had an Adequate Justification for its Subsequent Treatment of
Tayoun

The third prong of the test establishing First Amendment protection for an

employee's speech charges courts to discern whether "the government employer

did not have an adequate justification for treating the employee differently from

any other member of the general public as a result of the statement he made."

Hara, 492 Fed. App'x at 267.  This is a fact intensive inquiry that is often left to a

jury.  See, e.g., Zamboni v. Stamler, 847 F.2d 73, 79 n.6 (3d Cir. 1988) ("We note

that these inquiries, which follow a determination that speech is protected, are for

the jury.").

An employer's "professed belief that he hired [a plaintiff's replacement]

because she was 'right for the job' can not, by itself, be accepted as an adequate

[non-discriminatory] explanation for rejecting [a plaintiff]."  Iadimarco v. Runyon,

190 F.3d 151, 167 (3d Cir. 1999).[7]  "After all, a hiring official's subjective belief that an individual would not 'fit in' or was 'not sufficiently suited' for a job is at least as consistent with discriminatory intent as it is with nondiscriminatory intent: The [sic] employer just might have found the candidate 'not sufficiently suited' for the position *because of* . . . engaging in a protected activity."  Patrick v. Ridge, 394 F.3d 311, 317 (5th Cir. 2004).

Not surprisingly, the Parties present two differing theories for the events subsequent to Tayoun's speech in this case.  Tayoun believes that he was demoted from Police Chief and treated unfavorably "because [he] turned in another cop who was friends with [Mayor Klush]."  Tayoun Dep., at 22:9–12.  Defendants counter that they have the power to demote the Police Chief without cause,[8] and that Mayor Klush believed it was time for a

---

[7] The Third Circuit's decision in Iadimarco v. Runyon, 190 F.3d 151 (3d Cir. 1999), was in the context of a Title VII case, not a First Amendment action.  Nevertheless, the employment context principles in this case and in others cited remain instructive in the case at bar.

[8] Defendants cite 53 P.S. § 37002 for this authority, which stated at the time:

The mayor shall designate, from the force, the chief and other officers who shall serve as such officers until their successors are appointed and qualified.  The Police Chief shall be designated by the mayor and may be demoted without cause in the same manner, but not to any rank lower than the rank which he held at the time of his designation as Police Chief.

53 P.S. § 37002 (amended May 18, 2014).

change when he took office.  See Pl.'s Br., at 16–17.  Nevertheless,

demoting a Police Chief when a new administration took office without

soliciting resumes or holding a single interview for his replacement was an

unprecedented occurrence in Pittston.  See id.; Klush Dep. 41:21–24.

Furthermore, Defendant Klush testified to their differing accounts of

the reasons for Tayoun's demotion and treatment at his deposition, stating:

> Q.    He's saying one thing, you're saying another, and it's up to
>        someone to believe who's telling the truth, correct?
> A.    Uh-huh.
> Q.    I'm sorry?
> A.    Correct.

Klush Dep., 59:21–60:1.

"Evaluation of witness credibility is the exclusive function of the jury, and

where the only evidence of intent is oral testimony, a jury could always choose to

discredit it."  Bhaya v. Westinghouse Elec. Corp., 832 F.2d 258, 262 (3d Cir.

1987).  The evidence proffered by both sides in this case is primarily oral

testimony that is often in conflict.

Viewing the facts in the light most favorable to the non-moving party as

required on summary judgment, material facts remain in dispute on the issue of the

Defendants' adequate explanation.  See Anderson, 477 U.S. at 248.  These

disputed facts are also material to demonstrating the elements of retaliatory action

24

and the causal link between the speech and the retaliatory conduct that are

necessary for a First Amendment retaliation claim.  See, e.g., Thomas, 463 F.3d at

296.  Accordingly, these issues are inappropriate for summary judgment and

should be submitted to a fact finder.

## III.    CONCLUSION

For the foregoing reasons, Plaintiff Tayoun's speech reporting a police

officer's criminal activity was speech protected under the First Amendment.

Further disputed material facts preclude the resolution of this case on summary

judgment, and the Defendants' Motion is denied.

An appropriate Order follows.

BY THE COURT:


s/Matthew W. Brann
Matthew W. Brann
United States District Judge